COURT OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                FORT
WORTH

 

 

                                                 NO.
2-09-331-CV

 

 

IN THE INTEREST OF K.S., A
CHILD                                                                    

 

                                                       ------------

 

              FROM
THE 323RD DISTRICT COURT OF TARRANT COUNTY

 

                                                       ------------

 

                                      MEMORANDUM OPINION[1]

 

                                                       ------------

I. 
Introduction








The trial
court terminated Appellant Mother=s
parental rights to K.S. after finding that her parent-child relationship had
been Aterminated
with respect to another child based on a finding that [her] conduct was in
violation of [section] 161.001(1)(D) or (E), Texas Family Code@ and that
terminating her parental rights to K.S. was in K.S.=s best
interest.[2]
See Tex. Fam. Code Ann. ' 161.001(1)(M),
(2) (Vernon Supp. 2009).  In two issues,
Mother challenges the legal and factual sufficiency of the evidence to support
the best interest finding.  We affirm.

II. 
Termination of Parental Rights

A.  Standard of Review

A parent=s rights
to Athe
companionship, care, custody, and management@ of his
or her children are constitutional interests Afar more
precious than any property right.@  Santosky v. Kramer, 455 U.S. 745, 758B59, 102
S. Ct. 1388, 1397 (1982); In re M.S., 115 S.W.3d 534, 547 (Tex.
2003).  AWhile
parental rights are of constitutional magnitude, they are not absolute.  Just as it is imperative for courts to
recognize the constitutional underpinnings of the parent-child relationship, it
is also essential that emotional and physical interests of the child not be
sacrificed merely to preserve that right.@   In re C.H., 89 S.W.3d 17, 26 (Tex.
2002).  In a termination case, the State
seeks not just to limit parental rights but to erase them permanentlyCto divest
the parent and child of all legal rights, privileges, duties, and powers
normally existing between them, except for the child=s right
to inherit.  Tex. Fam. Code Ann. '
161.206(b) (Vernon 2008); Holick v. Smith, 685 S.W.2d 18, 20 (Tex.
1985).  We strictly scrutinize
termination proceedings and strictly construe involuntary termination statutes
in favor of the parent.  Holick,
685 S.W.2d at 20B21; In re M.C.T., 250
S.W.3d 161, 167 (Tex. App.CFort
Worth 2008, no pet.).








In
proceedings to terminate the parent‑child relationship brought under
section 161.001 of the family code, the petitioner must establish one ground
listed under subsection (1) of the statute and must also prove that termination
is in the best interest of the child. 
Tex. Fam. Code Ann. ' 161.001;
In re J.L., 163 S.W.3d 79, 84 (Tex. 2005).  Both elements must be established;
termination may not be based solely on the best interest of the child as
determined by the trier of fact.  Tex.
Dep=t of Human Servs. v. Boyd, 727 S.W.2d
531, 533 (Tex. 1987).

Termination
decisions must be supported by clear and convincing evidence.  Tex. Fam. Code Ann. '' 161.001,
.206(a) (Vernon 2008).  Evidence is clear
and convincing if it Awill produce in the mind of the
trier of fact a firm belief or conviction as to the truth of the allegations
sought to be established.@ Id. ' 101.007
(Vernon 2008).  Due process demands this
heightened standard because termination results in permanent, irrevocable
changes for the parent and child.  In
re J.F.C., 96 S.W.3d 256, 263 (Tex. 2002); see In re J.A.J.,
243 S.W.3d 611, 616 (Tex. 2007) (contrasting standards for termination and
modification).








In
reviewing the evidence for legal sufficiency in parental termination cases, we
must determine whether the evidence is such that a factfinder could reasonably
form a firm belief or conviction that the grounds for termination were
proven.  In re J.P.B., 180 S.W.3d
570, 573 (Tex. 2005).  We must review all
the evidence in the light most favorable to the finding and judgment. Id.  This means that we must assume that the
factfinder resolved any disputed facts in favor of its finding if a reasonable
factfinder could have done so.  Id.
We must also disregard all evidence that a reasonable factfinder could have
disbelieved.  Id.  We must consider, however, undisputed
evidence even if it is contrary to the finding. 
Id.  That is, we must
consider evidence favorable to termination if a reasonable factfinder could,
and disregard contrary evidence unless a reasonable factfinder could not.  Id.

We must
therefore consider all of the evidence, not just that which favors the verdict.  Id.  But we cannot weigh witness credibility issues
that depend on the appearance and demeanor of the witnesses, for that is the
factfinder=s province.  Id. at 573, 574.  And even when credibility issues appear in
the appellate record, we must defer to the factfinder=s determinations
as long as they are not unreasonable.  Id.
at 573.

In
reviewing the evidence for factual sufficiency, we must give due deference to
the factfinder=s findings and not
supplant the judgment with our own. 
In re H.R.M., 209 S.W.3d 105, 108 (Tex. 2006).  We must determine whether, on the entire
record, a factfinder could reasonably form a firm conviction or belief that
termination of the parent-child relationship would be in the best interest of
the child.  Tex. Fam. Code Ann. '
161.001(2); C.H., 89 S.W.3d at 28.  If, in light of the entire record, the
disputed evidence that a reasonable factfinder could not have credited in favor
of the finding is so significant that a factfinder could not reasonably have
formed a firm belief or conviction in the truth of its finding, then the
evidence is factually insufficient. H.R.M., 209 S.W.3d at 108.

B.  Best Interest








There is
a strong presumption that keeping a child with a parent is in the child=s best
interest.  In re R.R., 209 S.W.3d
112, 116 (Tex. 2006).  Prompt and
permanent placement of the child in a safe environment is also presumed to be
in the child=s best interest.  Tex. Fam. Code Ann. ' 263.307(a)
(Vernon 2008).  Among others, the
following factors should be considered in evaluating the parent=s
willingness and ability to provide the child with a safe environment:

the child=s age and
physical and mental vulnerabilities; the frequency and nature of out‑of‑home
placements; whether there is a history of substance abuse by the child=s family
or others who have access to the child=s home;
the willingness and ability of the child=s family
to seek out, accept, and complete counseling services and to cooperate with and
facilitate an appropriate agency=s close
supervision; the willingness and ability of the child=s family
to effect positive environmental and personal changes within a reasonable
period of time; and whether the child=s family
demonstrates adequate parenting skills. Id. ' 263.307(b);
R.R., 209 S.W.3d at 116.

Other,
nonexclusive factors that the trier of fact in a termination case may use in
determining the best interest of the child include:

(A)     the desires of the child;

 

(B)     the emotional and physical needs of the child now and in the
future;

 

(C)     the emotional and physical danger to the child now and in the
future;

 

(D)     the parental abilities of the individuals seeking custody; 








(E)     the programs available to assist these individuals to promote
the best interest of the child;

 

(F)     the plans for the child by these individuals or by the agency
seeking custody;

 

(G)     the stability of the home or proposed placement;

 

(H)     the acts or omissions of the parent which may indicate that the
existing parent‑child relationship is not a proper one; and

 

(I)      any excuse for the acts or omissions of
the parent.

Holley v. Adams, 544 S.W.2d 367, 371B72 (Tex. 1976).  


 

These
factors are not exhaustive; some listed factors may be inapplicable to some
cases; other factors not on the list may also be considered when
appropriate.  C.H., 89 S.W.3d at
27.  Furthermore, undisputed evidence of
just one factor may be sufficient in a particular case to support a finding
that termination is in the best interest of the child.  Id. 
On the other hand, the presence of scant evidence relevant to each
factor will not support such a finding.  Id.

C.  Evidence

1.  Mother and her Children








Mother is
thirty-three years old and has given birth to six children. Fourteen-year-old
Bradley[3]
and nine-year-old Bethany live with Mother=s sister,
although Bethany sometimes lives with Mother. 
Twelve-year-old Kathleen lives A[b]etween
[Mother] and [Kathleen=s paternal] grandmother.@[4]  Mother=s parental
rights to three-year-old Peter were terminated in October 2006 on endangerment
grounds.  See Tex. Fam. Code Ann. ' 161.001(1)(D),
(E), (2).  Her parental rights to
two-year-old Pam were terminated in February 2008 on endangerment grounds.[5]  See id. K.S. was born on July 25,
2008.[6]

2.  Mother=s Drug
Use

Mother
testified that she did not remember the first time that she used an illegal
drug or started using cocaine or heroin, but she admitted that in 2005, her
drug use caused her child Bethany to have to live with Mother=s sister.
Mother was on methadone while pregnant with Peter, and she used drugs while
pregnant with Pam Abecause [she] didn=t plan on
having her@ and had planned to have an
abortion A[f]rom day one.@













K.S. was
conceived around November or December 2007. 
Mother agreed that she might have told a doctor at John Peter Smith
(JPS) hospital in May 2008 that she had stopped using heroin three months
earlierCthat is,
around February or March 2008Cand she
admitted that she probably used illegal drugs for at least a month or two
before she realized that she was pregnant with her sixth child, K.S.  She stated that she would not have used drugs
if she had known she was pregnant and that she did not use cocaine after she
discovered that she was pregnant.  Mother
testified that she did not think that two months of drug use while pregnant
endangered K.S. A[b]ecause she was born and it
didn=t.@[7]  Mother testified that once she discovered she
was pregnant and started seeing a doctor, in March or April 2008, the doctor
sent her to a methadone clinic so that she would not Atake the
chance or risk of using heroin while [she] was pregnant.@[8]  Mother said that she did not think the
methadone would be harmful to use because the doctor knew she was pregnant and
gave it to her.

Nona
Pickler, the neonatal nurse-practitioner who admitted K.S. to JPS=s
neonatal intensive care unit (NICU) on July 28, 2008, testified that it is
common practice for a doctor to give a mother methadone if the mother is trying
to quit using heroin.  AIt=s
considered safer because of the means they have to go through to get heroin.@

Pickler
testified that K.S. was transferred to NICU at two-and-a-half-days old because
she was exhibiting withdrawal symptoms. 
K.S. was placed on morphine shortly after admission to treat her
withdrawal from methadone.[9]
After ten days of morphine, K.S. still required treatment.  Pickler noted that not all babies have such
severe withdrawal.

In April
2009, Mother stated that it had been a year since the last time she used heroin
and that she had probably used cocaine less than ten times since K.S.=s
birth.  Sheila Quarterman, who became
Mother=s second
CPS worker in December 2008, testified that Mother told her in March 2009 that
it had been three months since she last used any kind of illegal drugs.  Mother testified that she told Quarterman
that her hair follicle test could be positive








[b]ecause it goes back up to six months, and I know back then, when I
first started going through this, and I have a habit of, instead of making a
situation better, I go the opposite way and dig into a deeper hole, so
therefore, you know, I did use, because that was the answer to my problems
instead of me doing what I was supposed to do, so I knew if it goes that
far back that I would, but I have not used drugs in a long time.  [Emphasis added.]

 

She testified that her answer to
K.S. being in foster care had been cocaine. 

Mother
also listed the drugs for which she had prescriptions: SeroquelCwhich she
testified had been prescribed the day before trial started in April 2009Cfor mood
swings; hydrocodoneCwhich she had started taking in
July 2008Cfor her teeth; and Celexa, for
depression.  She testified that she could
not recall the name of her dentist, that she could not pronounce her
psychiatrist=s name, and that she did not have
health insurance.

3.  Mother=s Service
Plan








Daisy
Yancy, Mother=s first CPS worker, gave Mother a
service plan,[10]
which was filed in September 2008. 
Mother testified that she knew what a service plan was, that she
received one in October 2008, that she most recently received one in March
2009, and that her service plan required random urinalysis tests and hair
follicle drug tests, a psychological evaluation, parenting classes, individual
counseling, and a drug and alcohol assessment. 
The record reflects that the service plan contained not only those
activities but also asked Mother to Aidentify
appropriate relatives and friends that are willing to help care for [K.S.] . .
. [and] secure a stable contact phone number to maintain regular contacts with
the family members and the caseworker@; Acomplete
all tasks on her service plan and maintain regular contact with the caseworker
[and] notify her caseworker . . . of any problems with her services or any
changes of her contact phone number and address@; Amaintain
regular and consistent contact with [K.S.] via supervised visits by [CPS]@; Aseek and
maintain legal gainful employment to allow her financial independence, and to
provide [CPS] with proof of her employment@; and Amaintain
stable housing that is safe and appropriate for [K.S.] and submit proof of
housing to [CPS] . . . [and] allow the [case]worker to assess her home as
needed for home assessments.@

Mother
did not work on the service plan from October 2008 through December 2008.  She explained, 

I wasn=t going
to do it because I didn=t never have a reason why they
took my child to begin with, and I talked to a couple of lawyers, and I was
supposed to hire me a lawyer that was going to fight for all of this, so I wasn=t for
sure if I was even going to have to go through all that or not.








She reiterated that she Awasn=t
planning on doing none of that, because [she] was getting a lawyer,@ and that
a lawyer told her that she would not have to do the service plan.[11]  Quarterman testified that when she first
spoke with Mother, Mother was very hostile and A[s]he
stated that she wasn=t going to do any of the
services; her lawyer had told her she wouldn=t have
to.@[12]  Mother also attributed her failure to work
services to a lack of communication.[13]  She said that she did not consider that it
had been six months since she received the service plan but rather saw it as
just one month because no judge told her to work the service plan until March
2009.  By April 2009, Mother had not had
a visit with K.S. since October 2008.[14]








Regarding
a court-ordered hair follicle drug test in March 2009, Mother gave a sample of
leg hair that was too short for testing. 
She stated, as to giving a hair sample from her head, AI don=t want
that . . . and I=m not doing it.@[15]  She testified, A[T]he
lady told me that it was fine to take it off my leg because I had enough hair
[on my legs]@; therefore, she concluded, it
was not her fault that her leg hair sample was insufficient.  Mother subsequently agreed that she would
submit to a hair follicle drug test using the hair on her head Aif that
was the last resort, but there is other ways they can do it.  I would do whatever I have to do to get my
child back.@       

Mother
said that CPS told her that she did not have to do another psychological
evaluation, and Quarterman confirmed this. 
Mother claimed that she had completed her parenting classes, but she was
referring to the ones that she took as part of her CPS service plans for either
Peter or Pam, before K.S. was born.  On
April 23, 2009, Quarterman testified that she was under the impression that
Mother had completed the parenting classes recently, that she was not sure
whether completing the parenting classes before K.S. was born met CPS=s
requirements, and that Mother had not completed her drug and alcohol assessment
or her individual counseling.








Mother
testified that she was supposed to go to her alcohol and drug assessment on
April 23 and that it had taken so long to schedule because she did not know her
CPS caseworker had been changed until March. 
Mother=s first contact with Quarterman
was a week or so before the March 18, 2009 hearing.  They scheduled a meeting, but Mother failed
to appear, so their first encounter was at the March 18 hearing.  Quarterman said that she learned of Mother=s address
Afor
certain on March 18th.  I had already
sent her out, when I first took over the case, a registered letter asking her
to contact me, and it came back.@

Mother
testified that she pays $500 a month in rent on a three-bedroom, two-bath house
and that she has lived there throughout the case.  Mother described a friend, Van Alvin, who she
has known for ten years, as a Agod-friend@ that
pays her bills, including her utilities. 
She stated that she did not know what kind of work he did, that he was
an older man, that he helps her with her other children, and that she trusts
him.  She testified that her cable bill
is in P.B.-H.=s name and that she could not
remember the last time she was employed full-time, but it was not during the
last year.  For the last two years, she
has occasionally helped her godmother, Ruby, with Ruby=s
catering business; she works for Ruby at least once a month and does odd jobs.

Quarterman
testified that she did not know whether Mother=s
residence was safe for a child because 

we=ve had some trouble
getting hold of each other.  I would call
her and her phone would be shut off, and the other day, I did call to schedule
an appointment to go out to see her home, and when she answered, she told me
that she was sleeping and she would call me back, and she never called me back.

 








CPS visited Mother=s
residence in August 2009.  Mother
explained the presence of a man=s
clothing as belonging to her fourteen-year-old son, who she said is six feet,
three inches tall and wears a size fourteen in men=s
shoes.  She testified that her son loves
clothing, AHe loves clothes and shoes, and I
have a hundred pairs of shoes.@

Mother
twice received additional time to work on her service plan.  On March 18, 2009, the trial court granted
her a continuance.  After hearing
evidence at the April 23, 2009 termination trial, the trial court gave her
until August 10, 2009, when the termination trial resumed.[16]

By August
2009, Mother had a third CPS worker, Carson,[17]
who testified that Mother had not completed her parenting classes and
counseling and that Mother had not attended her Comprehensive Addiction
Treatment Services (CATS) outpatient drug treatment sessions since July 15,
2009.  Carson testified that Mother had
been to every visit since April 23 except for one that was cancelled by the
transporter and that CPS did not have the results back from Mother=s most
recent drug test.








Mother
testified that CPS had requested four drug tests since April, that she had
taken all but one, and that the three she had taken were negative.[18]
She testified that she had two parenting classes left, that she went to
individual counseling every week, and that, based on her drug and alcohol
assessment, she went into a seven-day inpatient drug rehabilitation for
Vicodin, which had been prescribed for her because her teeth hurt.  She testified that she had not been abusing
Vicodin and that she did not remember what she told the assessors for her to be
admitted to inpatient treatment.  Mother
finished rehab on June 15, 2009, and then started CATS.  With regard to her CATS sessions, Mother was
not sure how many she had completed but testified that she had eight left.  She stated that she tried to go to her CATS
sessions every day but sometimes she could not make it because she had other
appointments, including doctor=s
appointments, and her other children, and because Ait=s the
summertime@ and she had been doing Aeveryday
stuff.@  She testified that she is in Narcotics
Anonymous (NA) and has a sponsor.

4.  Plans for K.S.








Mother
gave conflicting testimony about K.S.=s foster
parents.  At first, she testified that
she was not related to K.S.=s foster
mother and that she had no relationship with K.S.=s foster
parents that allowed their involvement in the case.  But Mother also testified that the foster
mother was Mother=s sister=s cousin,
that she had no concerns about the foster parents= ability
to take good care of K.S., that she believed the foster parents were taking
good care of K.S., and that she had no problem with K.S. continuing to live
with the foster parents Aother than that she needs to be
with [Mother].@[19] 

Quarterman
testified that K.S. was doing very well with the foster parents, that she had
seen K.S. in the foster parents= home,
and that the foster parents wanted to adopt her.  The foster mother testified that K.S. had
been in her home since October 2008, when K.S. was three months old.  She testified that she had known Mother all
of her life, that Mother had not called to inquire about how K.S. was doing Asince the
first of the year,@ and that Mother had not brought
K.S. anything.[20]


Mother
received the foster mother=s cell
phone number in October 2008 and was supposed to contact her every
Wednesday.  Athough Mother testified that
she Aused to
see [her] child all the time when she first got took with [sic] CPS,@ she did
not remember whether she only saw K.S. twice at visits when K.S. was first
placed into foster care, and she admitted that she had not called K.S.=s foster
mother for a couple of months.








The foster
mother testified that she believed Mother=s
parental rights to K.S. should be terminated based on Mother=s past
history and in K.S.=s best interest.  She and her husband, along with their son who
was graduating from high school, had decided that if Mother=s
parental rights to K.S. were terminated, they wanted to adopt K.S. because they
love her. 

Mother testified
that she was a responsible parent and that the court should allow her to keep
her parental rights to K.S. A[b]ecause,
for one, [she] didn=t do nothing for her to get
taken, and for two, [she was] trying to do what [she was] supposed to do to get
her back.@ 
She testified that she loves K.S. and wants her back, and at the April
2009 trial, she asked the trial court, APlease
give me time to do what I=ve got to do, because I=m trying,
and everything that=s done happened is not my
fault.  It=s CPS=s fault
also. They=re just as accountable as I am.@[21]  At the April 2009 trial, Quarterman testified
that she did not believe the trial court should allow Mother any more time and
that termination of Mother=s
parental rights would be in K.S.=s best
interest.[22]








In
August, Mother made one more plea to the trial court for K.S.=s return,
stating:

Give me my baby back and continueCI continue
everything I=m supposed to do, and as long as
I don=t mess up
everything, I have my baby, and I=ll still
do drug tests, finish up my classes, whatever else.  Just give me my baby, because there is
nothing more for me to have motivation and strength with my baby with me than
having to go see her one hour on a Friday every day; then when she leaves me
she cries and all that stuff.  I mean,
I think my baby should be with me.  How
can I get to know her if she=s not
with me?  [Emphasis added.]

Carson
opined that Mother had had enough time between April 23, 2009, and August 10,
2009, to complete her parenting classes, CATS, and individual counseling.  She asked the trial court to terminate Mother=s
parental rights to K.S. as in K.S.=s best
interest. 

D.  Analysis

Mother
argues that the evidence is legally and factually insufficient to prove that
termination of her parental rights is in K.S.=s best
interest because the evidence at trial showed that she was not at fault for
K.S. exhibiting withdrawal symptoms[23]
and because she has shown a desire to stay away from illegal drug use and to
develop better parenting skills Aby her
accomplishments toward the objectives of the Family Service Plan prior to the
second trial hearing.@ 








However,
as recounted above, not only does Mother have a significant substance abuse
history, but for the duration of most of the case, she was unwilling to
cooperate with CPS and undertake the services that would return K.S. to her,
even though she had been through the process twice before with Peter and
Pam.  See Tex. Fam. Code Ann. ' 263.307(b)(10)B(11); R.R.,
209 S.W.3d at 116; see also In re M.R., 243 S.W.3d 807, 821 (Tex. App.CFort
Worth 2007, no pet.) (recognizing parent=s failure
to comply with family service plan may be factor, among others, supporting best‑interest
finding). 








Instead,
Mother dropped out of contact with CPS and K.S.=s foster
parents, and out of K.S.=s life, for around six months,
and she admitted turning to drugs during that time.  The trial court could have concluded from
Mother=s failure
to complete her service plan after receiving two opportunities to finish itCthe
continuance after the March 2009 hearing and again until the August 2009 trialCand her
failure to remain in contact with K.S.=s foster
parents even after she renewed contact with K.S. and her CPS worker that K.S.
would be subjected to high levels of emotional danger if Mother were to retain
her parental rights.  See Holley,
544 S.W.2d at 371B72.  The trial court could have concluded that Mother=s
inadequate parenting skillsCtwo
previous termination of parental rights cases and three remaining children
living with her part-time, if at allCand her
shaky finances, depression, and potential for relapsing into drug addiction
also posed unreasonable physical and emotional dangers to one-year-old
K.S.  Compare In re S.A.G., No.
02-09-00125-CV, 2010 WL 1006301, at *8 (Tex. App.CFort
Worth Mar. 18, 2010, no pet.) (mem. op.) (holding evidence supporting best
interest finding was factually sufficient when, among other reasons, Mother had
a past history of not being able to provide her children with a safe environment,
as established by the termination of her rights to another child based on
endangerment and abandonment findings, failed to complete the parenting classes
required under her service plan, and had an ongoing pattern of memory
problems), and In re J.W., No. 02-08-00211-CV, 2009 WL 806865, at
*7 (Tex. App.CFort Worth Mar. 26, 2009, no
pet.) (mem. op.) (holding evidence supporting best interest finding was legally
and factually sufficient, considering mother=s
continuing course of illegal drug use, transience, failure to complete
individual counseling and parenting classes, to do the psychological
evaluation, to provide proof of gainful employment, and to attend more than thirteen
of forty-four scheduled visits), with In re W.C., 98 S.W.3d 753, 765B66 (Tex.
App.CFort
Worth 2003, no pet.) (holding evidence factually insufficient to support best
interest finding when, among other things, the mother fully complied with her
service plan in all respects except for her court‑ordered child support
payments; the evidence showed that she had made significant progress,
improvements, and changes in her life; and the record reflected that there was
nothing more she could have done in order to have her children returned).








The trial
court could have chosen to believe Carson, rather than Mother, with regard to
Mother=s
progress since April on her service plan.[24]  Mother admitted that K.S.=s foster
parents take good care of her.  K.S.=s foster
parents testified that they love K.S. and want to adopt her.  Quarterman, Carson, and K.S.=s foster
mother each testified that terminating Mother=s
parental rights to K.S. would be in K.S.=s best
interest; in contrast, Mother=s
testimony focused on Mother=s need
for K.S., rather than K.S.=s best
interest.  Viewing the evidence in the
light most favorable to the finding and judgment, we conclude that the evidence
is such that the trial court could reasonably form a firm belief or conviction
that termination of Mother=s
parental rights is in K.S.=s best
interest.  See J.P.B., 180 S.W.3d
at 573.  And we conclude, in light of the
entire record, that the trial court could reasonably form a firm conviction or
belief that termination is in K.S.=s best
interest.  See H.R.M., 209 S.W.3d
at 108.  We hold that the evidence is
legally and factually sufficient to support the trial court=s best
interest finding, and we overrule Mother=s two
issues.  

 

 

III. 
Conclusion

Having
overruled both of Mother=s issues, we affirm the trial
court=s
judgment.








BOB MCCOY

JUSTICE

 

PANEL:  GARDNER, WALKER, and MCCOY, JJ.

DELIVERED: June 17, 2010

 











[1]See Tex. R. App. P. 47.4.





[2]The trial court also
terminated the parental rights of P.B.-H., K.S.=s alleged father, but
P.B.-H. does not appeal.





[3]We use aliases for the
children=s names.  See Tex. R. App. P. 9.8(b)(2).





[4]Mother testified that her
three older children live with her Awhenever they=re there@ and that it was Anot an everyday thing
because my sister don=t want no problems or
whatever, but they come and theyCwell, they just live with me because my sister
kind of stayed there or whatever for like six months or whatever.@





[5]Mother stated that she Adid stuff@ on her service plans in
those cases, that she Ajust didn=t show up on the last
court date because [she] had the time wrong,@ and that her rights were terminated. 





[6]Mother is not sure who
K.S.=s father is.  She testified that he could have been
P.B.-H., who is also Peter and Pam=s alleged father, or he could have been someone
that she met Aon the streets@ a few years back.  P.B.-H.=s parental rights to Peter and Pam were terminated
in the same orders terminating Mother=s rights to them.





[7]Mother elaborated with the
following testimony,

 

Q.  Do you believe that your use of drugs while
you were pregnant with [K.S.] placed her in danger?

 

A.  No, because I didn=t use while I was pregnant
with her up until I found out I was pregnant and started going to the
doctor.  Then the doctor put me on
methadone and that was that.  I did not
use no more after I was pregnant with her. 
She was fine.





[8]The Child Protective
Services (CPS) affidavit in support of the Department of Family and Protective
Services (DFPS) petition indicates that Mother tested positive for cocaine in
March, April, and May 2008, but not at K.S.=s delivery in July 2008.  Mother admitted that her urinalysis drug
tests were positive in March and April 2008.





[9]Pickler described
methadone withdrawal symptoms: 
irritability, seizures, sweating, diarrhea, and tachypnea (rapid
breathing) from metabolic acidosis. K.S. had to have intravenous fluids to
supplement her intake because she was not able to eat.





[10]A CPS service plan
requires a parent to perform certain tasks to ensure that reunification with a
child will provide the child with a safe environment. See In re A.D.,
203 S.W.3d 407, 409 (Tex. App.CEl Paso 2006, no pet.).





[11]Mother stated that the
trial=s purpose was A[a] big lie.@  She claimed that CPS never told her why it
became involved with K.S.CAthey lied and took my
child from NICU talking about she had withdrawal from methadone and then
talking about they had to find out if I was legally on methadone.@





[12]The trial court appointed
a lawyer for Mother on August 6, 2008. 
By August 22, 2008, a different lawyerCthe one who represented
her at the termination trialCappears in the record.  Although Mother told Quarterman that she had
hired a lawyer, Mother=s subsequent testimony
that A[she] was planning on
getting a lawyer to fix all of this,@ makes it seem more likely that she never actually
hired a lawyer before one was appointed for her.





[13]Mother also complained
about some delays with her CPS referrals for services.  Quarterman explained that Mother had a
previous service authorization for her individual counseling and was discharged
from the program when she missed that appointment so Quarterman had to fax a
new authorization.  Quarterman testified
that all of the payment paperwork for Mother=s services had been done in advance of Mother
trying to schedule the appointments.





[14]Mother responded, AIf you say so,@ when asked whether she
had only limited or no contact with CPS or her child from August 2008 to
February 2009.  After March 18, 2009,
when Mother resumed contact with CPS, one of the visits had to be cancelled by
CPS and Mother missed the other because she was sick.  Mother attributed missing other visits to her
lack of transportation.





[15]Mother stated, AI could have done [the head
hair sample], but I told the judge that day I wasn=t going to take it off,
and she said as long as they could take it from anywhere that that was fine,
and that=s what they did.@





[16]The trial court terminated
P.B.-H=s parental rights after
the April 23, 2009 trial.





[17]The record is unclear with
regard to this worker=s first and last namesCthe worker is reported
solely as ACarson@ in the reporter=s record, but in the clerk=s record, AVicki Garza@ is listed.





[18]Mother testified that she
missed the fourth drug test because she was at a visit with K.S. and two of her
older children and she did not make it in time, giving the following
explanation: 

 

[I asked w]ell, can you be
at the office by 5:00 or 5:30 or something like that, and she was like, if you
come and the doors are not open or locked already, just call me and I=ll open the door or
something or other, and I was like, okay, but I have da-da-da-da-da to do, but
I will try to get up there, and she was like, okay, but I didn=t make it, but I went that
following week the next time she asked me. 
[Emphasis added.]

 





[19]Mother testified that the
foster parents were taking good care of K.S. but that she Acan take care of her just
as well.@





[20]Quarterman also testified
that Mother never called her about having any clothes, food, or toys for
K.S.  Mother said that everything for
K.S. was at home and that the foster mother Asaid to keep it so when if [K.S.] comes back to
[Mother], [Mother] will have it.  It=s okay; [the foster
mother] will buy her whatever she needs.  
She has a roomful of stuff from diapers, wipes, clothes, baby bed,
bouncers, stroller, or walker at my house right now.@





[21]In April, Mother reminded
the trial court, A[W]hen I came last time,
you told me as long as I=m doing what I=m supposed to do that you
would give me time.@ 





[22]Quarterman explained that
she thought Mother=s parental rights should
be terminated A[b]ecause [K.S.], she=s bonded well with the
[foster parents]. She=s thriving.  [Mother], although she has attempted in the
last month to do some services, it would appear that she waited almost until
the court hearing to start working services.@





[23]Mother attributes K.S.=s withdrawal symptoms to
her efforts to rehabilitate herself from her past drug use during pregnancy,
rather than the actual use of illegal drugs during pregnancy.





[24]The trial court had two
separate opportunities to assess Mother=s credibility, and we cannot say, based on the
record presented to us, that its determination was unreasonable.  See J.P.B., 180 S.W.3d at 573B74.